Finlayson v. Lipscomb—Syllabus.

A. F. FINLAYSON, APPELLANT, vs. JOHN B. LIPSCOMB, APPELLEE, AND JOHN B. LIPSCOMB, APPELLANT, vs. A. F. FINLAYSON, APPELLEE.

1. A cross bill is a pleading which necessarily precedes a final decree. Up to the hearing it is proper for the court upon proper showing under oath to permit such a bill to be filed. It is proper so to do when it appears that the suit as instituted is insufficient to bring before the court all matters necessary to enable it fully to decide upon the rights of the parties.

2. Leave to file a supplemental bill in the nature of a bill of review should not be granted in a case where it is apparent that for months before publication and hearing, a reasonable degree of diligence on the part of the party would have resulted in his ascertaining the new evidence proposed to be brought forward. Where the new evidence appears to be the testimony of named witnesses and the other requirements of the law are complied with, the petition should be accompanied by the affidavits of such persons to the new facts alleged, or some good reason be given why they were not produced. Some of the cases upon the subject of leave to file a supplemental bill in the nature of a bill of review considered.

3. Where, in a foreclosure suit, the defense is a satisfaction of a mortgage debt, and the evidence in the case upon the part of the plaintiff con-

sists of the debt established by judicial proceedings and outstanding up to the institution of the suit, the mortgage, and plaintiff's denial of any payment or satisfaction, and the evidence upon the part of the defendant is his own testimony in direct conflict with this written evidence and the testimony of the plaintiff, the testimony of defendant's son, which is uncertain and indefinite, and to part only of a conversation between the parties, and the testimony of a third party not plainly in conflict with plaintiff's testimony, the court should find for the plaintiff. Especially is this true when the assault upon the mortgage debt involves the regularity and propriety of proceedings in a collateral suit. Under the peculiar circumstances of this case the decree is affirmed without prejudice to any right to proceedings which the defendant may have, looking to a re-sale of the property alleged to have been sold by the fraud and covin of the plaintiff at a price less than its value, or to file an original bill to set the sale aside, or to his action for damages.

Appeal from the Circuit Court for Madison county.

The facts of the case are stated in the opinion of the court.

*S. Pasco* for Finlayson.*

*A. Paterson* for Lipscomb.

Mr. Justice Westcott delivered the opinion of the court.

This is a bill brought by W. J. Hines and A. Florida Finlayson, appellants, against John B. Lipscomb, to foreclose a mortgage upon lands in Madison county.

Plaintiffs allege that defendant executed to plaintiff, W. J. Hines, as executor of the last will and testament of John Finlayson, late of Jefferson county, deceased, his deed of mortgage upon certain lands described. Plaintiffs allege that on the 23d of March, 1870, Lipscomb, Dickinson, and

*This case was before the Supreme Court on appeal at January Term, 1876, and is incorrectly reported in 15th Florida Reports, 558, as *H. F. Finlayson, Appellant, vs. John B. Lipscomb, Appellee.* The counsel are also incorrectly reported there. Mr. Pasco represented the *appellant* and Messrs. Paterson & Pope the *appellee* in that appeal. This correction is made at the request of Mr. Pasco.—REPORTER.

Ardis executed their promissory note to W. J. Hines as executor for the sum of $4,656 gold coin; that to secure payment of the same these parties executed a mortgage upon certain lands in Madison county; that on the 23d of July, 1870, the mortgagors applied to plaintiff, to whom the said note and mortgage had been transferred in the settlement of the estate of John Finlayson, to release a portion of the lands mortgaged, offering to substitute other lands; that this proposition was accepted, and in lieu of the lands thus surrendered the present mortgage was substituted, being duly executed by the said John B. Lipscomb and wife; that having failed to pay the notes mentioned they were put in judgment, the mortgage made by Dickinson, Ardis, and Lipscomb was foreclosed, the lands sold, and the proceeds credited on the debt and mortgage, leaving due $1,896.83. The plaintiffs then, following the usual form of allegation and prayer, seek a foreclosure and sale of the mortgaged lands. To this bill defendant Lipscomb answers. He admits the execution and delivery of the mortgage, admits that the notes were sued to final judgment, the sale of the lands, and the application of the proceeds to the payment of the debt, the property bringing less than the debt, the complainant being the purchaser. The defendant then alleges that on the day of the sale, which defendant was unable to attend on account of the death of his wife, complainant came to defendant's house, in response to a message from defendant, and told defendant not to interfere with or put himself to any trouble on account of the sale, that he, complainant, would bid the property in and satisfy the judgment against defendant; told this defendant that the property was worth the judgment, and that he would take it and satisfy it; that in reply to an effort which had been made by some of defendant's friends to postpone the sale one or two months in order that arrangements which were in progress to make the lands bring the amount of the judgment

might be completed, complainant said there was no necessity for such arrangements, as he would take the lands in satisfaction of the claim, urging at the same time that a postponement of the sale would only induce further and greater costs, when there was no necessity for it under the arrangements between him and defendant; that at the same interview complainant promised this defendant to release the mortgage sued on in this action, and this defendant, relying on these promises of complainant, sent word to his friends who were representing his interest to let the sale proceed, telling them of the arrangements with complainant.

There was replication and proof. The proof was substantially as follows:

The plaintiff introduced the original mortgage and the proceedings in the antecedent foreclosure of the other mortgage, showing the balance due on the debt after giving credit for the amount of the bid.

John B. Lipscomb, the defendant, testified: "When the plaintiff foreclosed the mortgage on the other property witness was unable to attend the sale, his wife having died the night before the sale. Witness understood that his brother and some other friends were making arrangments to bid in the property, make it bring the amount of the debt, or to postpone the sale, and witness then sent for Dr. Hines to come to his house, and he did so. That witness and Dr. Hines talked about the sale, and Dr. Hines told the witness that the sale need not be postponed, that it would just increase cost, and that he would release the mortgage sued on in this action; that he would take the other property for the debt. Witness then sent word to his brother and friends that they need not bother any more about the sale, to let the place sell, as it was all understood between him and Dr. Hines; witness thought that the mortgage sued on in this action was released until several months afterwards. The plaintiffs bought the property

about five or six months afterward. Dr. Hines told witness that he thought on the day of sale that he would release the mortgage sued on in this action, but things had not turned out as well as he had expected. Witness asked Hines if he did not promise to release it on that day, and he said yes, and he thought he would, but the expenses had been so heavy for costs and lawyer fees. Sometime afterwards he brought this suit."

John B. Lipscomb, Jr., a son of the defendant, testifies "that on the day when his father's place was sold that his father sent witness down for Dr. Hines. Witness saw Dr. Hines at the court-house and told him that his father wanted to see him, and he went up just behind Hines. Dr. Hines and witness' father had a conversation before the gate. Witness was in the yard. Witness heard Dr. Hines say that witness' father might sell the Mosely place at any time, that he would release the mortgage. Witness' father told witness to come down town and tell his uncle Milledge and Mr. Frank Mosely not to bother any more about that matter, as he had seen Dr. Hines and made it all right with him. Witness came down town and saw his uncle Milledge and Mr. Frank Mosely talking together, and he told them that his father said not to bother about that matter, as he had seen Dr. Hines and made it all right with him. The house mentioned as the Mosely house is the property in dispute in this action."

John B. Lipscomb, recalled, says, alluding to the foreclosure of the first mortgage: "Before the referee's report was filed I went with the referee to Dr. Hines and talked with the Doctor about purchasing the land back, but he would not state his price, or that he would not sell, saying that he did not care particularly to sell, as John Finlayson would soon be of age, and he wanted the place for him."

John H. Pope, M. D., being sworn for plaintiff, says: "That in a conversation with Dr. Hines, Dr. H. told him

that he was satisfied with the security for the debt of the firm of Dickinson, Lipscomb & Co., and would not have to interfere with the property in controversy in this action. The impression received from the conversation was, that he would not disturb Mr. Lipscomb in the possession of the property in controversy."

W. J. Hines being sworn on behalf of plaintiff testified: "I had as many as three conversations with J. B. Lipscomb, the defendant, all before the sale of the mortgaged property, in all of which I made the following proposition to Mr. Lipscomb: that if, on the day of sale, I purchased the property and could sell it at private sale upon time at an amount sufficient to cover the indebtedness of Dickinson, Lipscomb & Co. to myself and Mrs. Finlayson, as trustees of John Finlayson, that I would ignore the mortgage on the Mosely land now sued upon; that I was waiting for Mr. Lipscomb, or any of his friends, to take the property under mortgage of Dickinson, Lipscomb & Ardis, and which was sold by commissioners, upon their paying or securing the amount due to us as trustees. I was acting in this matter as trustee of John Finlayson. There was no memorandum or writing made of these conversations, or of this proposition, and there was no consideration paid for the same. It was a mere voluntary proposition on my part. There was no promise made to release the mortgage on Mosely property, except upon the conditions stated, and they have never been complied with. There has been nothing paid on the judgement against Dickinson, Lipscomb & Ardis since the amounts mentioned in the referee's report as a sale of the mortgaged property."

Upon cross-examination this witness said: "I received this mortgage as a substitute for the release of lands under another mortgage made by Mr. Lipscomb and others to myself and Mrs. Finlayson, or to myself as an executor of John Finlayson. I think the release was brought to me to sign,

and that I refused to sign it until the other parties to the original mortgage would agree to it. I do not recollect whether it was before or at the time I had the first conversation about the release. I do not recollect which paper came into my hands first. I never did tell Mr. Lipscomb that he might sell the Mosely property, that I would release it. I did not tell Mr. Lipscomb on the day of sale that I would take the property for, the debt. I never told Mr. Lipscomb on the morning of the day of the sale that he need not bother himself about the sale. I was sent for in the morning of the day of the sale by Mr. L., and I went up to his gate some time before the sale came off. I do not recollect what Mr. Lipscomb first said to me on the morning of the day of sale. I do not recollect of Mr. Lipscomb saying anything to me about postponing the sale, or of his saying anything to me about his not bidding on the land, or telling his friends not to do so. I do not recollect of telling Mr. L. that I thought on the day of sale that I would take the property sold for the debt, but that I did say to Mr. Lipscomb, upon or after the day of sale, that if I could sell the property for an amount sufficient to pay his award I would release the mortgaged property. I used my utmost exertions with several parties to sell the lands, but failed."

The rest of the testimony of this witness simply states that he recollects no conversation with Mr. Lipscomb on the day of sale about the two places, or that his ward could take the land. " I was unwilling to let Mr. Lipscomb have the place which was sold under the first mortgage, because I did not believe he could make the payments."

After hearing, the Chancellor entered a decree establishing the debt and for foreclosure and sale of the mortgaged premises.

Upon the rendition of this decree, and before its enrolment, a petition for rehearing was filed. The prayer of the petitioners was granted, and a rehearing allowed. From

this order an appeal was taken.  This court held, upon the appeal, that where a final decree was signed and pronounced, but not recorded and entered, and the case is sought to be reheard on new facts discovered since publication passed, the remedy is by supplemental bill in the nature of a bill of review, (15 Fla., 558,) and reversed the order allowing a rehearing.

In the record of this cause as now presented, we find a pleading which was not to be found in the original record before us on the first appeal, although it bears a file mark of the 2d of December, 1875, while the notice of appeal is dated the 28th December, 1875, and service of the cross bill was acknowledged the same day.

The purpose of this cross bill is to get affirmative relief against defendant by a decree satisfying the mortgage debt alleged to be due in this suit, the defendant alleging and repeating therein the facts set up in his answer before recited, the principal ground upon which relief is sought being the allegation that the plaintiff agreed to take the property for the whole debt, and bid it off with this distinct understanding.

At a subsequent date this bill was answered, plaintiff reserving the point that a cross bill cannot be filed after final decree.

On the 17th of April, A. D. 1876, the defendant filed a petition for leave to file a supplemental bill in the nature of a bill of review.  The allegations of this petition are stated in a subsequent portion of this opinion where it is considered.

He then prayed leave to file a supplemental bill in the nature of a bill of review.  Leave to file the supplemental bill was granted.  The supplemental bill, after reciting previous proceedings, sets up substantially the facts alleged in the petition as to the agreement of Hines to cancel the mortgage for the debt, and that the land was worth the whole of

the debt, and would have brought the debt if the bidding had not been prevented by the act and agreement of Hines. There was also a general demurrer to the supplemental bill.

Upon these pleadings the cause was heard, the supplemental bill in the nature of a bill of review was pronounced sufficient, and leave to file the cross bill granted. From the several orders recited, including the original decree of foreclosure, appeals are taken by the several parties plaintiff and defendant.

We first examine the matter of granting leave to file a cross bill, after final decree rendered, and before it is reheard, or opened by any subsequent proceeding. A cross bill is a pleading which always necessarily precedes a final decree. It is true that after publication, and even up to the hearing, the court will permit it to be filed, where it appears that the suit as instituted is insufficient to bring before the court all matters necessary to enable it fully to decide upon the rights of all the parties; but no case can be found where a cross bill is permitted after final decree. After publication passed, in order to stay proceedings upon a cross bill, the matters stated should be sworn to by some person who knows the facts. 9 Paige, 410.

The first question which the Circuit Court, upon remanding this case, was called upon to decide was the question of leave to file a supplemental bill in the nature of a bill of review, to bring forward new testimony. What is the nature of the showing that a party asking leave to file such a bill must make? It must be borne in mind that a bill in the nature of a bill of review does not lie until after final decree pronounced. If we examine this matter with reference to the analogies of common law trials, we will see that the simple allegation of the defendant setting up discovery of new evidence since the trial would not prevail for the purposes of a new trial, if the court saw plainly from the showing made that the affidavits of disinterested parties

were apparently within the reach of the party and he failed either to produce such proof or account for its absence. There has been but one case in this State in which the subject was considered to any extent, (the case of Owens vs. Forbes' administrators, 9 Fla., 326.) That was the case of an interlocutory decree where the defendant sought a review upon the ground of evidence discovered since publication. In that case the court held that "to entitle the party to relief in such cases, the newly-discovered evidence must be relevant and material, and such as might probably have produced a different determination. The new matter must have first come to the knowledge of the party after the decree. The matter must not only be new, but it must be such as the party, by the use of reasonable diligence, could not have known. It must not be merely cumulative, nor merely corroborative or auxiliary to what is already in the case, but must establish a new fact of itself decisive of the merits of the cause."

In that case the failure of the person who made the search for certain records (which were deemed material) to state his acts in the matter under oath, was regarded by the court as a circumstance deserving mention. With all the strictness of the rule as there stated by Judge Forward in an opinion showing no small amount of research, he still took occasion to say that the statement of facts as there made, in the petition presented, should not be followed as a precedent, and to some extent excused the defendants from the required diligence and inquiry by the fact that they were administrators.

Judge Forward in this opinion refers with approbation to the views of Mr. Justice Story in Dexter vs. Arnold, 5 Mason, 310. It will be there observed that while there is considerable difference in the views of the courts, Mr. Story, while he does not so decide, inclines to the view that *new proof* of matter clearly in issue, if that proof is in the shape

of written evidence, may be produced as well as new facts. Speaking, however, of the testimony of new witnesses he says: "If it be admissible (upon which I am not called to decide) it ought to be received with extreme caution, and only as it is of such a nature as ought to be decisive proof." In Kentucky the evidence of new witnesses is rejected. (Harden Reports, 342.) Chancellor Kent's view, as announced in 3 John. Ch., 124, is that any new evidence must not be a mere accumulation of witnesses to the same fact, but some stringent written evidence or newly-discovered papers. The petition here alleges in general terms "that after the cause was submitted, he discovered new evidence material to his defence, which he could not by due diligence have produced at the former hearing; that the newly-discovered evidence is material to his case, John L. Miller, Hunter Pope, and others; that he expects to prove that at the former foreclosure referred to in the bill of complaint and at the sale there were bidders on the ground who would have bid the amount of the debt had they not been prevented by W. James Hines, trustee, who told them that the property was his, and that it was no use for them to bid. He also avers that the land thus sold was and is worth the amount of the debt."

So far as the value of this property is concerned that certainly was not new matter discovered since publication or decree. So far as the sale is concerned that was not new matter, nor can we upon any proper ground reach the conclusion that there was anything like reasonable diligence in this matter. The defendant knew of the sale, and by a simple examination of the foreclosure proceedings in the first suit, and certainly he must be held to this degree of diligence, he would have seen that it was bid off for less than the debt.

It is apparent from his answer to the original bill that he knew facts which should have led him to this examination and to the knowledge of all that he now alleges came to his

knowledge since decree or publication. Again, the witnesses by which this is to be established are named. No affidavit of theirs as to their knowledge is produced, and no reason is given for their non-production.

We are not prepared to say that the matter here proposed to be produced is new matter within the meaning of the authorities, but if this be conceded the record does not make a case of reasonable diligence. The defendant had months after the sale to inquire into the facts, and his mind had been directed to the inquiry as to the reason for the failure of the land to bring the debt. He says it was the agreement of the plaintiff to take the land for the debt, and inquiry to that end was the most natural thing possible for a business man of ordinary prudence and attention. Even when controlled by the rules adopted by the most liberal courts in this respect, we cannot see how we can sustain this action of the court in granting the prayer of this petition.

Mr. Justice Story, speaking of this subject, says, " *The qualification of the rule is that the matter must not only be new, but it must be such as the party, by the use of reasonable diligence, could not have known, for if there be any laches or negligence in this respect, that destroys the title to relief.*" Story's Eq. Pl., §414.

Having disposed of the matter of the cross-bill and of the petition for leave to file a supplemental bill in the nature of a bill of review, we reach the only remaining question, and that is the final decree. From this decree defendant appeals. Had we concluded otherwise than we have upon the question of the cross-bill and petition for leave to file the supplemented bill, the matter of the final decree would not have been properly a subject of review by this court, but of rehearing by the court below. As it is, however, this question is properly presented. It is held in proceedings in the same suit that if a purchaser at a sheriff's

sale succeed by false statements or suggestions in deterring others from bidding, and they obtain the property for an inadequate price, the sale will be set aside and a re-sale ordered. 5 Ind., 487 ; 7 Black., 275 ; 25 Ill., 173.

It is held also that as a matter of public policy the law provides in various ways for a fair competition in sales made by its authority, and generally whatever prevents it is a fraud. (3 John. Cases, 29.) Acts preventing a fair competition are also held to constitute a fraud on the debtor and his remaining creditors. So if "puffers" at an auction enhance the price and deceive other bidders, and they are in fact misled, it is held that the sale will be held void as against public policy. The reason is, a fair competition is prevented. (7 Black., 267 ; 5 John., 194 ; 8 John., 444.) These rules are announced in cases arising between the parties, or those having notice of these equities.

In this case the defence as to the prior decree is presented collaterally. We have here neither a bill original in its character, nor a proceeding in the same suit in which the sale occurred asking relief. This proceeding is a collateral assault upon a prior decree and sale, made months after the sale occurred. 2 Pet., 162 ; Rorer on Jud. Sales, 466.

The plain and sure remedy of this party was a petition to the court after the sale to set it aside, or an original bill to accomplish the same purpose, if his proofs were sufficient to justify such action. His failure here so to do for months must, to some extent, control this court in reviewing the issues presented in the cause as heard upon the final decree. His laches, with a plain remedy, indicate a simple desire for delay in a suit asking a foreclosure of this mortgage.

The defence in this suit is that the mortgagee agreed to bid in the property and cancel the debt. We have in the statement of the case inserted the testimony at length. Between the plaintiff and defendant there is a clear, plain and direct conflict.

So far as the testimony of Dr. Pope is concerned, it is not inconsistent with the testimony of plaintiff Hines. He says that Dr. Hines said to him that he was satisfied with the security for the debt of the firm of Dickinson, Lipscomb & Co., and would not have to interfere with the property in controversy in this action. The impression received was that he would not disturb Mr. Lipscomb in the possession of the property in controversy. It is entirely probable, and there is no doubt of the fact, that this statement was made. This was Hines' opinion at the time stated; but upon what principle can a party, speaking casually of a friend's indebtedness, be held to a mere statement of what, perhaps, was his hope, that it would not be his unpleasant duty to enforce a second mortgage for the same debt, when he had two mortgages to secure it?

As to the testimony of the son of the defendant in this cause, it is both uncertain and indefinite, and does not purport to give the whole conversation had at the time, and for these reasons not entirely inconsistant with that of the plaintiff Hines. This witness testifies that he heard Hines say that his father might sell the land now in controversy at any time; that he would release the mortgage; that his father told him to go and tell certain parties (his uncle and Frank Mosely) not to bother any more about the matter of bidding, as he had seen Dr. Hines and made it all right. This testimony is entirely consistent with the statement of Dr. Hines that he agreed with defendant that he would, even after a sale, give time to pay the debt and redeem the land.

Plaintiff's son simply says that he heard Dr. H. say that there would be no use for selling the second place mortgaged; and this may have been, as Dr. H. says, upon the hypothesis that defendant would pay the whole debt and thus prevent it.

Upon the testimony and record as presented, in view of the principles which must control us, this decree must be

affirmed. As against the mortgage and against a legally-established and ascertained debt, we cannot accept such testimony as sufficient to pass a decree of satisfaction.

The decree must be affirmed without prejudice to any right the defendant may have to a proceeding in the suit in which the first mortgage was foreclosed, or without prejudice to any right he may have to file an original bill to set that sale aside, or to an action for damages.

As a matter of course we do not determine that there is any such right; we only save it from the operation of this decree, if it exists. The orders in this cause granting leave to file a cross-bill and a supplemental bill in the nature of a bill of review, are reversed and set aside; the cross-bill and supplemental bill in the nature of a bill of review, are set aside; and the decree of the Circuit Court of the Third Judicial Circuit, herein rendered on the 29th day of May, A. D. 1875, is affirmed, without prejudice to defendant's right, if any such there be, to a proceeding in the suit in which the first mortgage was foreclosed, or to file an original bill in reference thereto, or to an action for damages for the alleged fraud in such sale.